## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

**JAMES RICHARD HUFFMAN IV**                                                               **PLAINTIFF**

**v.**                                                          **CIVIL ACTION NO.  3:21-CV-P217-JHM**

**KATHERINE WILLIAMS** *et al.*                                                            **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

This is a *pro se* 42 U.S.C. § 1983 prisoner civil-rights action.  This matter is before the Court on the motion for summary judgment filed by the Wellpath Inc., Defendants (DN 232).  Plaintiff has filed a response (DN 250), and Defendants have filed a reply (DN 262).  This matter is ripe for adjudication.  For the following reasons, Defendants' motion for summary judgment will be granted.

**I**.

At all times relevant to this action, Plaintiff James Richard Huffman IV was incarcerated as a convicted prisoner at Luther Luckett Correctional Complex (LLCC), where Wellpath, Inc., (hereinafter "Wellpath") had been contracted by the State to provide medical care to prisoners. Upon initial review of the superseding amended complaint pursuant to 28 U.S.C. § 1915A, the Court allowed Eighth Amendment claims for deliberate indifference to Plaintiff's serious medical needs to proceed against the following Wellpath, Inc., employees in both their individual and official capacities – Nurse Practitioner Katherine Williams, Dr. Jessica Fortwengler, LPN Sasha Grey, RN Cortney Forgy, and RN Shane Johnston (DN 112).[1]

At the outset, the Court observes that Plaintiff's official-capacity claims are actually against Wellpath, the individual Defendants' employer.  *See Kentucky v. Graham*, 473 U.S. 159, 166

---

[1] In its initial review, the Court also allowed claims to proceed against Wellpath employees Dawn Patterson and Sarita Schoenbachler.  However, the Court subsequently dismissed those claims as time-barred.  *See* DNs 194 & 206.

(1985) ("Official-capacity suits . . . 'generally represent [ ] another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 n.55 (1978)).  As the record reflects, after Defendants filed their motion for summary judgment, Wellpath filed for bankruptcy in the United States Bankruptcy Court for the Southern District of Texas (DN 251).  The Court takes judicial notice that the bankruptcy court confirmed Wellpath's First Amended Joint-Chapter 11 Plan of Reorganization, which discharged Plaintiff's claim against Wellpath in this action.  *See In re Wellpath Holdings, Inc.*, No. 24-90533 (Bankr. S.D. Tex. May 1, 2025), ECF No. 2596.  Because Wellpath is no longer a party to this action, Plaintiff's argument that Wellpath is liable for his injuries because it had an unconstitutional custom or policy of denying or delaying medical care to prisoners at LLCC will not be considered herein.

Thus, the only remaining claims against the Wellpath Defendants are the individual-capacity claims against Defendants Williams, Fortwengler, Grey, Forgy, and Johnston.

**II.**

Before the Court may grant a motion for summary judgment, it must find that there is "no genuine dispute as to any material fact" and that the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

Assuming the moving party satisfies its burden of production, the nonmovant "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Celotex*, 477 U.S. at 324). The non-moving party's evidence is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the party opposing summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The fact that a plaintiff is *pro se* does not lessen his or her obligations under Rule 56. "The liberal treatment of pro se pleadings does not require the lenient treatment of substantive law, and the liberal standards that apply at the pleading stage do not apply after a case has progressed to the summary judgment stage." *Johnson v. Stewart*, No. 08-1521, 2010 U.S. App. LEXIS 27051, at *6-7 (6th Cir. May 5, 2010) (citations omitted).[2]

### III.

On May 26, 2020, Plaintiff was involved in a fight with another prisoner which caused him to suffer facial injuries. DN 250-3, Incident Report, PageID #5138. After the fight, but prior to being placed in segregation, Plaintiff was seen by Defendant Nurse Grey. DN 232-1, Pl.'s Wellpath Med. Rec., PageID #4263-4264. During her assessment, Defendant Grey observed that Plaintiff had two black eyes but noted that he denied any loss of vision or dizziness. *Id.*, PageID #4264. She advised Plaintiff to apply ice and prescribed him "Acetaminophen Tablet, 325 MG, 2 tablets as needed, Orally, BID, 5 days, 20 Tablet." *Id*. She also advised Plaintiff to notify staff if

---

[2] In their motion, Defendants argue that they are entitled to summary judgment both on the merits of Plaintiff's claims and because Plaintiff failed to exhaust his administrative remedies as to those claims. Because the Court herein concludes that Defendants are entitled to summary judgment on the merits, the Court does not address the exhaustion issue or consider the evidence submitted that goes to that issue.

he had any additional symptoms. *Id*. In his affidavit, Plaintiff states that he never received any pain medication or ice while in segregation and that Nurse Grey knew that he would not. DN 250-5, Pl. Aff., PageID #5194, ¶¶ 3-4.

The following day, on May 27, 2020, Plaintiff submitted a healthcare request stating that he "Can't chew food. Face is train wreck." *Id*., PageID #4261. It appears that Plaintiff was seen on that date by Defendant Grey and non-Defendant Elaine Smith, a nurse practitioner. *Id*. Upon examination, they observed bruising and swelling to Plaintiff's left eye and that his face was asymmetrical. *Id*. They offered Plaintiff a "soft or pureed diet," gave him a bag of ice, and ordered an x-ray of his face. *Id*. The record shows that non-Defendant Smith ordered an x-ray of Plaintiff's face after this examination. DN 232-1, PageID #4261, #4265. In Plaintiff's affidavit, he states that that he never received the acetaminophen that Defendant Grey prescribed him, even though he "begged the pill call nurses for it," and that he was unable to obtain ice while in segregation. DN 250-5, PageID #5194, ¶¶ 3-4. Plaintiff states that he only told Defendant Grey that he would be unable to obtain ice in segregation. *Id*., ¶ 4.

Plaintiff was seen by Defendant Williams the following day, on May 28, 2020, for "elbow drainage F/U altercation." *Id.*, PageID #4265. Her report states, "Inmate was in altercation on Monday. Reports losing LOC at the time of incident. Denies any change of consciousness since. Denies any other complaints. Reports right elbow is improving. Asks to see ortho doctor." *Id*. Defendant Williams noted that Plaintiff appeared "pleasant, well nourished, well developed" and in "no acute distress." *Id*. She also noted that Plaintiff was "alert and oriented" and had "no focal deficits." *Id*. Her assessment of Plaintiff was that he had "olecranon bursitis, right elbow . . . acute on chronic." *Id*. She recommended physical therapy for Plaintiff's elbow, but he refused, and she would refer him "to ortho if pain persists in a couple of months." *Id*. In complete contrast with

4

this medical record, Plaintiff states in the superseding amended complaint that he informed Defendant Williams that he had a broken orbital bone on this date and that he was intense pain and that he pleaded to be sent to a hospital, but Defendant Williams refused that request and denied him pain medication. DN 250-1, PageID #5118, ¶ 19.

Plaintiff's face was x-rayed at LLCC on May 29, 2020, and the radiologist who read the x-ray, Dr. Betz, reported no fractures or any other injury. DN 232-1, PageID #4265.[3] He then noted, "[i]f there is a high clinical index of suspicion, then CT is recommended because it is a more accurate exam." *Id*.

On May 30, 2020, Plaintiff filed another healthcare request stating, "Face is numb, not working, bone still broke." DN 232-1, PageID #4269. Plaintiff was then seen by Nurse Forgy on May 31, 2020. *Id*., PageID #4257. In her assessment, she indicates that Plaintiff told her that he could feel a "bone moving" below his left eye and that he rated his pain a "10/10." She also noted that he told her that he had been taking his prescription acetaminophen but that his left eye throbbed and ached. *Id*. Plaintiff also told her that although he could eat "100% of his meals," the rest of his face felt numb. *Id*. In her report, Nurse Forgy noted that Plaintiff had just had an x-ray which showed no facial fractures. *Id*. She then wrote, "Ecchymosis and edema present to bilat eyes/orbits; small 'divot' present to L zygomatic area proximal to bottom of left L eye, able to open/close mouth w/o difficult." *Id*. She then referred Plaintiff "to the provider," Defendant Williams, for an appointment regarding a possible fracture, and advised Plaintiff to continue to apply ice and to return immediately "should any sudden s/s develop." *Id*.

Plaintiff saw Defendant Williams again on June 4, 2020, and reported that he had "constant pain in left orbital space" and a "lump" under his left eye. DN 232-1, PageID #4255. Upon

---

[3] Dr. Betz is also a Defendant in this action and has filed a separate motion for summary judgment.

5

examination, she observed that Plaintiff had "bruising under bilateral eyes" and a "hard lump above maxillary bone of left," but that he was not in "acute distress." *Id*. She then noted that she was requesting approval "for a facial CT scan." *Id*. The request for the CT scan was approved by Wellpath's then Statewide Medical Director, Dr. Frederick Kemen, on June 5, 2020. DN 232-3, PageID #4326, ¶ 8.

On June 19, 2020, Plaintiff was seen by Defendant Johnston complaining of face and elbow pain. DN 232-1, PageID #4254. In his medical note, Defendant Johnston wrote that Plaintiff was "getting CT of head" and that "scheduling is currently working on this referral." *Id*. He then focused on Plaintiff's complaints regarding his elbow and cleansed Plaintiff's elbow wound, covered it with an adhesive bandage, and referred him to the provider for "olecranon bursitis." *Id*. In his note, Defendant Johnston stated he then "released Plaintiff to the yard in no apparent distress." *Id*.

On June 23, 2020, Plaintiff was seen by Defendant Williams again complaining of elbow and face pain. *Id*., PageID 4252. After noting that "scheduling is currently working on referral [for CT]," she conducted a physical exam of Plaintiff's elbow, noted that clear fluid came from the elbow wound if "manipulated," cleaned the elbow wound, and referred him for an "OA on olecranon bursitis." *Id*. In her report, she also stated that Plaintiff "was released to the yard in no apparent distress." *Id*.

On July 10, 2020, Plaintiff underwent a CT scan at Norton Healthcare, a private outside healthcare provider. *Id*., PageID #4266-67. The CT scan showed that Plaintiff had "multiple left-sided facial bone fractures." *Id*. On July 13, 2020, Plaintiff was seen by Defendant Williams, who reported his CT scan results to him, observed a "distinct lump" in the bone under his left eye, and referred Plaintiff to "oral and maxillofacial surgery." *Id*., PageID #4251. This request was

approved by Dr. Kemen on the same date, July 13, 2020. DN 232-3, PageID #4326, ¶ 8. Non-defendant "designated scheduling staff were [then] tasked with scheduling the outside appointment." *Id*. at ¶ 9.

The record next reflects that Defendant Forgy saw Plaintiff on July 24, 2020, who reported that his "eye crosses where orbital fracture occurred." DN 232-1, PageID #4244. Her report states that she "encouraged [Plaintiff] to take indomethacin as prescribed for facial bone pain" and informed him that "pain and muscle weakness are normal after a facial [fracture]." *Id*.

Plaintiff's medical records show that he was next seen by Defendant Williams on August 18, 2020, complaining of continued drainage from his elbow, and that she referred him to an appointment for the continued drainage and told him to report to medical if he suspected an infection in his elbow. DN 250-4, PageID #5175. Plaintiff states that when he asked her about seeing a surgeon for his facial injuries, she told him "Wellpath is in the process of scheduling an appointment and there was nothing more she could do." DN 250-2, PageID #5125. Plaintiff was also seen on by Defendant Forgy on September 1, 2020, regarding his continued elbow drainage. DN 250-4, PageID #5180. He avers that when asked her about seeing a surgeon for his face at this appointment she told him that Wellpath was in the process of scheduling an appointment for him. DN 250-2, PageID #5124.

On September 9, 2020, Defendant Williams received an email telling her that the University of Louisville ("UofL") Oral and Maxillofacial Surgery Department required referrals to be made through the UofL Emergency Department. DN 232-2, PageID #4322-23. Nurse Williams then forwarded this information to the LLCC Health Services Administrator, reiterating that Plaintiff had multiple face fractures. *Id*. Her email was then forwarded to Defendant

7

Fortwengler who immediately directed that Plaintiff be sent to the UofL Emergency Department so that he could be referred to an oral and maxillofacial specialist. *Id*.

On September 11, 2020, Defendant Williams ordered that Plaintiff be transported to the UofL Emergency Department for referral to an oral and maxillofacial specialist. DN 232-1, PageID #4289-92. It was there noted that Plaintiff had been assaulted "while in prison 2.5 months prior," that he "reported to outside hospital but did not see any one for follow up," and that he had "numbness of left cheek, nose." DN 232-4, PageID #4331. Another CT scan was performed at the UofL Emergency Department. DN 232-1, PageID #4307. This scan showed "chronic displaced fractures of the left lateral orbit [and] an inferior orbital rim (with marked displacement)." *Id*. The scan showed multiple other "chronic healing fractures." *Id*. Plaintiff was then referred to UofL oral and maxillofacial specialist Dr. Kendricks and was seen by him on September 18, 2020. DN 232-4, PageID #4330. Dr. Kendricks' notes reflect that on that date Plaintiff reported diplopia[4] and pain with "upward and downward gaze." *Id*. Plaintiff avers that Dr. Kendrick told him at this appointment that "the only surgery they were comfortable performing on me was to insert plastic discs into my eye socket as opposed to correctly setting by bones, which they would have done had I been transported to them within 90 days of injury." DN 250-5, PageID #5195, ¶ 11. According to Dr. Kendrick's report, he told Plaintiff that he could have surgery for his left orbital floor fracture or simply continued evaluation. *Id*. Plaintiff stated that he "would like to continue conservative evaluation at this time." *Id*. Plaintiff was scheduled to have a one-month follow-up appointment. *Id*.

---

[4] According to the Cleveland Clinic website, diplopia is the medical term for double vision. *See* https://my.clevelandclinic.org/health/diseases/22203-diplopia-double-vision. (last visited Aug. 25, 2025).

On October 22, 2020, Plaintiff reported to Nurse Forgy that he would like to see a surgeon regarding his "fractured orbital socket." DN 232-1, PageID #4275. She advised him that "he is being followed by the provider who will refer him if necessary." *Id*.

Plaintiff was seen by Dr. Kendrick again on November 18, 2020. DN 232-4, PageID #4330. At that appointment, Plaintiff reported that his pain had resolved but he still complained of "diplopia with upward vertical gaze." *Id*. Dr. Kendrick again discussed the option of surgery versus continued observation and Plaintiff "elect[ed] to continue observation." *Id*.

## IV.

The Eighth Amendment prohibits prison officials from showing deliberate indifference to a convicted prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A deliberate indifference claim "has objective and subjective components." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004). "The objective component requires the existence of a 'sufficiently serious' medical need." *Id*. (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "The subjective component requires an inmate to show that prison officials have 'a sufficiently culpable state of mind in denying medical care.'" *Id*. (quoting *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000)). For purposes of this Memorandum Opinion and Order, the Court will assume that Plaintiff's allegations satisfy the objective component of this standard. Thus, the Court need only analyze the second component herein.

As to the second, subjective component, "the plaintiff must show that [the] defendant acted with a mental state 'equivalent to criminal recklessness'" in response to the plaintiff's serious medical need. *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (quoting *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013)). Such a "showing requires proof that [the] defendant subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact

draw the inference, and that he then disregarded that risk by failing to take reasonable measures to abate it." *Id.* (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (internal quotation marks omitted)). Differences in judgment between a prisoner and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to establish a deliberate indifference claim. *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017); *Briggs v. Westcomb*, 801 F. App'x 956, 959 (6th Cir. 2020); *Mitchell v. Hininger*, 553 F. App'x 602, 605 (2014). The Sixth Circuit distinguishes "between cases where [there is] a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Where "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Rouster v. Saginaw Cnty.*, 749 F.3d 437, 448 (6th Cir. 2014). "Where the claimant received treatment for his condition, . . . he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell*, 553 F. App'x at 605 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).

In response to Defendants' motion for summary judgment, Plaintiff essentially argues that each Defendant who examined him after he was injured, and then after a CT scan showed that he had multiple facial fractures, and did not send him directly to an emergency room provided treatment to him that was so "woefully inadequate as to amount to no treatment at all."[5] However,

---

[5] To the extent that Plaintiff wants the Court to find the individual Defendants liable for what happened to him as a result of their collective actions, and potentially the collective actions of other non-Defendant Wellpath employees, the Court cannot. The Court must analyze Plaintiff's claims against each Defendant individually. *See, e.g., Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) ("Each defendant's liability must be assessed individually based on his own actions."); *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 564 (6th Cir. 2011) ("We must analyze separately whether Heyne has stated a plausible constitutional violation by each individual defendant, and we cannot ascribe the acts of all Individual Defendants to each individual defendant."); *Lanman v. Hinson*, 529 F.3d 673, 694 (6th Cir. 2008) ("This Court has consistently held that damage claims against government officials arising from alleged violations of

10

the Court must consider this argument in light of the admonition above that where "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake*, 537 F.2d at 860 n.5; *Rouster*, 749 F.3d at 448.

### A. LPN Grey

Plaintiff's medical records shows that Defendant Grey saw Plaintiff only twice with regard to his facial injuries – the night he was injured (before he was placed in segregation) and the following day. DN 232-1, PageID #4263-4264. As set forth above, during her initial assessment, Defendant Grey observed that Plaintiff had two black eyes but noted that he denied any loss of vision or dizziness. *Id.*, PageID #4264. She advised Plaintiff to apply ice and prescribed him "Acetaminophen tablet, 325 MG, 2 tablets as needed, Orally, BID, 5 days, 20 Tablet." *Id.* She also advised Plaintiff to notify staff if he had any additional symptoms. *Id.* And although Plaintiff argues that Defendant Grey knew he would not receive the prescribed acetaminophen or ice while in segregation, he has presented no evidence based upon personal knowledge to support this claim, only speculation.

The following day, on May 27, 2020, Plaintiff submitted a healthcare request stating that he "Can't chew food. Face is train wreck." *Id.*, PageID #4261. As stated above, Plaintiff's medical records show that he was seen on this date by Defendant Grey and non-Defendant Smith. *Id.* Upon examination, they observed bruising and swelling to Plaintiff's left eye and that his face was asymmetrical. *Id.* They offered Plaintiff a "soft or pureed diet;" gave him a bag of ice; and ordered an x-ray of his face. *Id.* As set forth above, in Plaintiff's affidavit, he states that he never received

---

constitutional rights must allege, with particularity, facts that demonstrate what each defendant did to violate the asserted constitutional right.").

11

the acetaminophen that Defendant Grey prescribed him, even though he "begged the pill call nurses for it," and that he was unable to obtain ice while in segregation. DN 250-5, PageID #5194, ¶¶ 3-4. Plaintiff states that he told Defendant Grey that he would be unable to obtain ice in segregation. *Id*. at ¶ 4.

Upon consideration, the Court concludes that the evidence shows that Defendant Grey did not act with deliberate indifference to Plaintiff's injuries. She prescribed prescription strength pain medication for him and her examination of him with Nurse Practitioner Smith the day after he was injured prompted Smith to order an x-ray for him on that date. Although Plaintiff argues that he should have been sent to an emergency room after this examination, Defendant Grey and Nurse Practitioner Smith decided to order an x-ray first. Moreover, although Plaintiff argues that the "pill call nurses" would not dispense the pain medication Defendant Grey had prescribed for his injuries, he does not state that he ever made Defendant Grey aware of this situation. Thus, upon the evidence presented, although Defendant Grey did not send Plaintiff to an emergency room or ensure that he received ice while in segregation, the Court concludes that no reasonable jury could find that the treatment provided by Defendant Grey was so "woefully inadequate as to amount to no care at all." *Mitchell*, 553 F. App'x at 605 (quoting *Alspaugh*, 643 F.3d at 169). *See, e.g., Arnett v. Webster*, 658 F.3d 742, 758 (7th Cir. 2011) (holding that a prison doctor's failure to investigate why a prisoner had not received the pain medication he had prescribed, after the prisoner reported it to the doctor on more than one occasion, may amount to negligence but does not show deliberate indifference).

### B. Nurse Practitioner Williams

Plaintiff's argument against Defendant Williams is that the evidence shows that she was deliberately indifferent to his facial injuries because it establishes that that she did not send him to

an emergency room after she examined him on May 28, 2020, or June 4, 2020, or on August 18, 2020, after a CT scan had shown that he had multiple facial fractures.

As set forth above, Plaintiff was first seen by Defendant Williams on May 28, 2020, for "elbow drainage F/U altercation," *Id.*, PageID #4265, two days after he was injured, and one day after Defendant Grey and Nurse Practitioner Smith examined his facial injuries and ordered an x-ray. Her report states, "Inmate was in altercation on Monday. Reports losing LOC at the time of incident. Denies any change of consciousness since. Denies any other complaints. Reports right elbow is improving. Asks to see ortho doctor." *Id*. Defendant Williams noted that Plaintiff appeared "pleasant, well nourished, well developed" and in "no acute distress." *Id*. She also noted that Plaintiff was "alert and oriented" and had "no focal deficits." *Id*. Her assessment of Plaintiff was that he had "olecranon bursitis, right elbow . . . acute on chronic." *Id*. She recommended physical therapy for Plaintiff's elbow but he refused and she would refer him "to ortho if pain persists in a couple of months." *Id*. In the superseding amended complaint, Plaintiff states that he informed Defendant Williams during this examination that he had a "broken orbital bone on this date," that he was intense pain, and that he pleaded to be sent to a hospital. DN 250-1, PageID #5118, ¶ 19.

Viewing the evidence in the light most favorable to Plaintiff, the Court accepts that Plaintiff pleaded to be taken to the emergency room on May 20, 2020, and that Defendant Williams did not send him. However, it appears that Defendant Williams made a medical judgment not to send Plaintiff to the emergency room knowing that an x-ray had been ordered the day before. The Court will not second guess this medical judgment.

Plaintiff next saw Defendant Williams on June 4, 2024, upon a recommendation from Defendant Forgy, who suspected, despite the radiologist's x-ray report, that Plaintiff may have a

13

facial fracture. DN 232-1, PageID #4255. As set forth above, when Plaintiff presented to Defendant Williams on this date, he reported "constant pain in left orbital space" and a "lump" under his left eye. *Id*. at PageID #4255. Upon examination, Defendant Williams observed that Plaintiff had "bruising under bilateral eyes" and a "hard lump above maxillary bone of left." *Id*. She then requested approval "for a facial CT scan," *id.*, and the request was immediately approved. DN 232-3, PageID #4326, ¶ 8. Thus, on this date, Defendant Williams made a medical judgment to order a CT scan for Plaintiff instead of sending him to an emergency room. The Court, again, will not second guess this medical judgment. Moreover, although the record shows that Plaintiff did not actually receive the CT scan until July 10, 2020 – more than one month after it was requested – the evidence shows that it was not Defendant Williams, but Wellpath administrative scheduling staff, who were tasked with scheduling this appointment. *Id.*, ¶ 7.

Defendant Williams then met with Plaintiff three days after the CT scan, on July 13, 2020, to tell him the scan showed that he had "multiple left-sided facial bone fractures." DN 232-1, PageID, #4257. And although Defendant Williams did not send Plaintiff to the emergency room on this date, she requested an "urgent referral for Plaintiff to an oral and maxillofacial specialist" which was approved on the same date. DN 232-3, PageID #4326, ¶ 9.

As noted above, Plaintiff's medical records show that he was also seen by Defendant Williams on August 18, 2020, complaining of continued drainage from his elbow, and that she referred him to an appointment for the continue drainage and told him to report to medical if he suspected an infection in his elbow. DN 250-4, PageID #5175.

The record next reflects that on September 9, 2020, Defendant Williams received an email telling her the UofL Oral and Maxillofacial Surgery Department required referrals to be made through the UofL Emergency Department. DN 232-3, PageID #4326, ¶ 10. Defendant Williams

14

then reported this information to the LLCC Health Services Administrator and Defendant Fortwengler, and Defendant Fortwengler directed that Plaintiff be sent to the UofL Emergency Department "for referral to an oral and maxillofacial specialist." *Id*. On September 11, 2020, Defendant Williams ordered that Plaintiff be transported to the UofL Emergency Department for referral to an oral and maxillofacial specialist. DN 232-1, PageID #4289-4292.

Although this course of events, including the lengthy delays in receiving scans and proper treatment is lamentable, to say the least, and leaves the Court wondering why more care was not taken to ensure that Plaintiff received timely and efficacious treatment for his multiple facial fractures, in light of the evidence above, the Court concludes that no jury could conclude that Defendant Williams' acted with reckless disregard to Plaintiff's serious medical needs or that she provided treatment to Plaintiff that was so "woefully inadequate as to amount to no care at all." *Mitchell*, 553 F. App'x at 605 (quoting *Alspaugh*, 643 F.3d at 169).

### C. RN Cortney Forgy

The Court next considers Plaintiff's claims against Defendant Forgy. As set forth above, on May 30, 2020, a few days after Plaintiff was informed that his x-ray had shown no broken bones, Plaintiff filed a healthcare request stating, "Face is numb, not working bone still broke." DN 232-1, PageID #4269. Plaintiff was then seen by Defendant Forgy on May 31, 2020. *Id*. at 4257. In her assessment, Defendant Forgy indicated that Plaintiff told her that he had been taking "Elavil, acetaminophen, and indomethacin for pain as prescribed," but that he could feel a "bone moving" below his left eye and that he rated his pain a "10/10." *Id*. Plaintiff also told her that although he could eat his "100% of his meals," the rest of his face felt numb. *Id*. In her report, Nurse Forgy noted that Plaintiff had just had an x-ray which showed no facial fractures. *Id*. She also noted "ecchymosis and edema present to bilat eyes/orbits" and a "small 'divot' under

15

Plaintiff's left eye. *Id*. She then referred Plaintiff to Defendant Williams for an appointment regarding a possible fracture and advised him to continue to apply ice and to return immediately "should any sudden s/s develop." *Id*.

Plaintiff's main complaints against Defendant Forgy are that she did not send him to the emergency room upon examining him and that he told her that he had not been given any ice or his prescribed acetaminophen since it was prescribed on May 27, 2020, and that Defendant Forgy did not follow upon on this report. Although Defendant Forgy, a registered nurse, did not send Plaintiff to the emergency room, she referred him to Defendant Williams, a nurse practitioner, "for possible facial fractures," and told him to return if any of his symptoms worsened. The Court declines to second guess this medical judgment. Moreover, the record reflects that it was Defendant Forgy's referral to Defendant Williams that ultimately led Defendant Williams to order a CT scan for Plaintiff. Finally, to the extent that Plaintiff faults Defendant Forgy for not investigating his complaint that he had not received his prescribed acetaminophen, the record reflects that Plaintiff was taking at least one other prescription medication for pain.

The record next reflects that Defendant Forgy saw Plaintiff on July 24, 2020, after his CT-scan, and reported that his "eye crosses where orbital fracture occurred." DN 232-1, PageID #4244. Her report states that she "encouraged [Plaintiff] to take indomethacin as prescribed for facial bone pain" and informed him that "pain and muscle weakness are normal after a facial [fracture]." *Id*. To the extent that Plaintiff faults Defendant Forgy for not sending him to the emergency room after this appointment, his medical records reflected that he had been referred to an oral and maxillofacial specialist. *See also Arnett*, 658 F.3d at 758 (holding that a prison doctor's failure to investigate why a prisoner had not received the pain medication he had prescribed, after

16

the prisoner reported it to the doctor on more than one occasion, may amount to negligence but does not show deliberate indifference).

Upon review, the Court concludes that no reasonable jury could conclude based upon the record above that the treatment provided to Plaintiff by Defendant Forgy was "so woefully inadequate as to amount to no care at all." *Mitchell*, 553 F. App'x at 605 (quoting *Alspaugh*, 643 F.3d at 169).

### D.  RN Johnston

As set forth above, Plaintiff's medical records show that he was seen by Defendant Johnston on June 19, 2020, complaining of elbow pain and face pain.  DN 232-1, PageID #4254. With regard to Plaintiff's face pain, in his medical note, Nurse Johnston wrote that Plaintiff had been approved for a CT scan and that "scheduling is currently working on this referral." *Id*.

Plaintiff's complaint against Defendant Johnston is that he begged Defendant Johnston to send him to the emergency room for his facial pain but that he did not.  However, Defendant Johnston's failure to send Plaintiff to the emergency room on June 19, 2020, is not sufficient to show that his treatment of Plaintiff was so "woefully inadequate as to amount to no care at all." *Mitchell*, 553 F. App'x at 605 (quoting *Alspaugh*, 643 F.3d at 169).  When Plaintiff saw Defendant Johnston, he had not been diagnosed with any facial fractures, and he was complaining of both face and elbow pain.  DN 232-1, PageID #4254).  And after Plaintiff's medical records revealed that Plaintiff had been referred for a CT scan for his face pain, Defendant Johnston focused on Plaintiff's complaints regarding his elbow – cleansing his elbow wound, covering it with an adhesive bandage, and referring him to a provider for "olecranon bursitis." *Id*.  Thus, the Court concludes that no reasonable jury could find that Plaintiff acted with reckless disregard to his serious medical needs.

17

**E. Dr. Fortwengler**

In his superseding amended complaint, Plaintiff alleged that Defendant Fortwengler, as Wellpath's Statewide Medical Director, is liable for the actions of the other individual Defendants, who were her subordinates, and for the delays in care for his facial fractures.

As to Defendant Fortwengler's role as the presumptive supervisor of the other individual Defendants, the doctrine of *respondeat superior*, or the right to control employees, does not apply in § 1983 actions to impute liability onto supervisors. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 80-81 (6th Cir. 1995); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). Moreover, the evidence presented shows that Defendant Fortwengler was only personally involved in Plaintiff's care on one occasion, when she received an email originally from Defendant Williams, on September 9, 2020, which indicated that Defendant Williams had just learned that Plaintiff had to be sent to the UofL emergency room to be seen by a UofL oral and maxillofacial specialist, and that Defendant Fortwengler responded to that email on the same date directing that Plaintiff be sent to the UofL emergency room. DN 232-2, PageID #4322.

As to Plaintiff's speculation that Defendant Fortwengler was responsible for his delays in care, the evidence shows that she was involved in Plaintiff's treatment on one occasion and that she immediately ordered that he be sent to the emergency room on that occasion. Thus, the Court concludes that no reasonable jury could find that Defendant Fortwengler acted with reckless disregard to Plaintiff's serious medical needs.

## IV.

For the foregoing reasons, **IT IS ORDERED** that Defendant Wellpath is **DISMISSED** from this action, and the remaining Wellpath Defendants' motion for summary judgment (DN 232) is **GRANTED**.

Date: September 2, 2025

Joseph H. McKinley Jr., Senior Judge
United States District Court

cc: Plaintiff, *pro se*
Counsel of Record
4414.011